UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

v.                              Case No. 01-CR-108

ORVILLE JEROME COCHRAN,

        Defendant.

## PLEA AGREEMENT

1. The United States of America, by its attorneys, Matthew D. Krueger, United States Attorney for the Eastern District of Wisconsin, and Carol L. Kraft, Scott J. Campbell and Laura S. Kwaterski, Assistant United States Attorneys, and the defendant, Orville Jerome Cochran, individually and by attorney John W. Campion, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### CHARGES

2. The defendant has been charged in three counts of a four-count indictment, which alleges violations of Title 18, United States Code, Section 1961(d) (racketeering conspiracy); Title 21, United States Code, Sections 841(a)(1) and 846 (conspiracy to distribute and possess with intent to distribute cocaine); and Title 18, United States Code, Section 844(i) (malicious destruction of property by fire).

3. The defendant has read and fully understands the charges contained in the indictment. He fully understands the nature and elements of the crimes with which he has been

charged, and those charges and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4. The defendant voluntarily agrees to plead guilty to Count One of the indictment which is summarized as follows:

*THE GRAND JURY CHARGES:*

*From a date unknown, but at least before January 1, 1988, and continuing to at least [May 16, 2001], in the Eastern District of Wisconsin and elsewhere, the defendant,*

***Orville Jerome Cochran**, a/k/a "Orvie"*

*[and others], being persons employed by and associated with an enterprise, that is, the Outlaws Motorcycle Club, which enterprise was engaged in, and the activities of which affected interstate and foreign commerce, knowingly, willfully and unlawfully did combine, conspire, confederate, and agree among themselves and with others . . . to commit an offense against the United States, to wit: to violate Title 18, United States Code, Section 1962 (c), that is to conduct and participate, directly and indirectly in the conduct of the affairs of the enterprise through a pattern of racketeering activity as that term is defined in Title 18, United States Code, Sections 1961(1) and (5); consisting of multiple acts involving state offenses of murder, attempt murder and conspiracy to commit murder; arson, attempt arson and conspiracy to commit arson; extortion, attempt extortion and conspiracy to commit extortion, all in violation of the laws of the States of Illinois, Wisconsin, Minnesota, Indiana, and New York; and multiple acts involving narcotics trafficking including cocaine and marijuana, in violation of Title 21, United Stated Code Sections 841(a)(1) and 846.*

2

*It was further part of the conspiracy that the defendants agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the enterprise.*

*All in violation of Title 18, United States Code, Section 1962(d).*

5. The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offense summarized in paragraph 4. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the following beyond a reasonable doubt. The defendant admits that these facts are true and correct and establish his guilt beyond a reasonable doubt: During the time-period covered by the indictment the defendant, Orville Cochran, was a member and at times the president of the Chicago Southside Chapter of the Outlaws Motorcycle Club. The Outlaws Motorcycle Club was an international organization with chapters located primarily in the eastern third of the United States. These chapters were grouped into regions and included Midwestern chapters, collectively known as the White Region; Florida chapters, collectively known as the Orange Region; northeastern chapters collectively known as the Blue Region; and southeastern chapters, collectively known as the Gray Region. For each chapter, there was a president, vice president, treasurer and enforcer as well as a general membership. Each region was also headed by a president and other regional officers. A national/international president or boss headed the entire organization. The club as a whole had strict membership requirements, which demanded the complete loyalty of all members and further demanded that members of the various regions support the chapters in other regions throughout the Outlaws nation. The defendant's Chicago Chapter was part of the Midwestern White Region.

During the time period alleged in the indictment, the Outlaws had a longstanding rivalry with the Hell's Angels biker club and their affiliate clubs, which included the Invaders, the

3

Hell's Henchmen, and the Sons of Silence. Until approximately 1993, the Outlaws "controlled" the Wisconsin-Illinois-Indiana territory that made up the White Region in that there were no Hell's Angels chapters within that territory. The closest Hell's Angels chapter was a single chapter located in Minneapolis. Beginning in late 1993 or early 1994, Outlaws bosses and members came to believe that the Hell's Angels were attempting to gain a presence in the Outlaws White Region territory by "patching over," the Hell's Henchmen, a biker club that had chapters located in Chicago, Rockford, and Calumet City, Illinois and in South Bend, Indiana. As the result, Outlaws bosses and members, including the defendant, agreed that they would engage in a series of assaults against the Hell's Henchmen and other Hell's Angels affiliate clubs so as to discourage those clubs from becoming Hell's Angels chapters and further, to discourage the Hell's Angels from further attempts to "infiltrate" the geographic area that had been traditionally known as Outlaws territory. Additionally, the Outlaws bosses and members of the White Region agreed that they would engage in similar activity when called upon to assist chapters in other regions that were engaged in similar rivalries with "enemy" clubs. During this time, the Outlaws considered themselves to be at war with the rival biker clubs. In furtherance of this war, various members of the White Region committed the racketeering offenses that are described as Overt Acts in Furtherance of the Racketeering Conspiracy, as set forth in paragraphs 31 through 76 of Count One of the Indictment.

For the purposes of this plea agreement, in addition to the above-summarized facts, the defendant, Orville Cochran, admits that he agreed that the following two racketeering acts would be committed by some member or members of the Outlaws Motorcycle Club in furtherance of the charged racketeering conspiracy, and further that he was present and participated in the events that comprise each of these acts.

4

Paragraphs 51 and 52. Illiana Speedway: Conspiracy to assault and murder rival bikers.

On or about June 26, 1994, a large group of Outlaws from the White Region, including the defendant, Orville Cochran, traveled from their clubhouses and homes in Illinois, Wisconsin, and Indiana, to the Illiana Motor Speedway, located in Schererville, Lake County, Indiana, with the intent to assault rival bikers at that location. The event at Illiana, known as Summer Madness, was calendared as an Outlaws Regional run in January of that year. Leading up to it, Outlaws members planned to confront members of a club known as the Invaders, a Hell's Angels-friendly biker group that had a previous history of attending Summer Madness at Illiana. According to then-Outlaws vice president, Carl Jay Warneke, that could include beating them, running them over with a car or motorcycle, or shooting them. The Outlaws believed that such aggression would discourage Hell's Angels affiliate club members from continuing to associate with the Hell's Angels and also send a message to the Hell's Angels that their presence would not be tolerated in Outlaws territory. Outlaws members from the Gary, Indianapolis, Chicago, Joliet, Milwaukee, and Wisconsin Stateline chapters all planned to attend. In preparation, Outlaws members who had concealed carry permits were directed to arm themselves, and two vans, one armored one from Milwaukee and van from Chicago, also contained firearms and other weapons. The vans were brought to Indiana as part of the Outlaws caravan that traveled to the speedway on the date of the racing event.

On the preceding evening, the Outlaws members who had gathered at the Gary Outlaws clubhouse in preparation for this event learned that their Regional Boss, Peter Rogers, known as "Grease," had been shot and seriously injured while riding his motorcycle on the Chicago Dan Ryan expressway after leaving an event at the Gary clubhouse. Again, according to Warneke, this news led the Outlaws bosses and members to conclude that the Hell's Henchmen were responsible for the attack on Rogers. At that time, the Outlaws correctly believed that the Hell's

Angels were actively courting the Hell's Henchmen and further believed that either the Hell's Angels were responsible for the attack on Rogers or that Hell's Henchmen members had shot him in order to show the Angels that they were worthy of becoming Hell's Angels. The assault on Rogers had the effect of intensifying the Outlaws' animosity towards the Hell's Angels, the Hell's Henchmen, and various other rival biker clubs including the Invaders.

On the morning of June 26, 1994, Randy Yager, then the boss of the Gary Outlaws chapter, assembled the Outlaws who had gathered at the Gary clubhouse for the ride to the Illiana Speedway. Once they arrived, the Outlaws set up an encampment that included two armored vans parked nose-to-nose right near a tree line, with the motorcycles parked in the grass behind them. The Outlaws bosses assigned various duties to the members in attendance. Government cooperator David Wolf, who was then a probate with the Wisconsin Stateline Outlaws chapter, noted the presence of the two armored vans both containing variety of handguns and long guns. He was kept busy running at the direction of the patched members, but noted that there was a lot of Outlaws activity near the parking lot, with members looking for the arrival of Invaders.

Peoria Outlaws member John Richard Jones was at the speedway. Indianapolis chapter boss, Frank Wheeler, had directed Jones to attend this event. About a week before the Illiana event, Wheeler had visited the Peoria chapter and had told Jones and other Peoria members that the Outlaws were expecting trouble at the Illiana Speedway in the form of Invader and Hell's Henchmen attendees, and that all of chapters in the Chicago Outlaws region were expected to attend. According to Jones, Wheeler told the Peoria Outlaws that if rival bikers were present, the Outlaws were to "shoot to kill." Jones traveled first to the Gary clubhouse, and on the day of the event, he participated in the procession that Yager organized to the speedway. Jones noted that the procession included a van driven by a Chicago Outlaw, and that another Chicago member

6

had told Jones that if he needed a gun, he could get one from the Chicago van. At the location of the Outlaws encampment, Jones saw Outlaws members openly carrying guns on their persons. Jones also heard a Chicago Outlaw advise others that if any rival bikers passed a line near the entrance guard shack, the Outlaws should open up their weapons. Jones took a high-powered rifle with a scope from the Chicago van and assumed a position in the grass, ready to shoot any rival bikers who crossed the imaginary line. Jones also observed a second van, also containing firearms, which he understood to belong to Milwaukee Chapter members.

While the Outlaws were at the speedway, Yager and the Milwaukee chapter boss, Edward Anastas, approached an ATF agent, who was present along with two uniformed Lake County Sheriff's deputies. During the encounter, Anastas demanded to know why ATF wasn't back in Chicago arresting Hell's Henchmen, and further advised that the ATF agent had better "get up to the front gate" and make sure no members of the Invaders showed up, or there "would be dead bodies all around."

As the day wore on, no rival bikers appeared and eventually the Outlaws packed up and left the speedway, with approximately 30-40 bikers riding their motorcycles in a procession through Gary. The procession was followed by the two armored vans. At about 6:00 p.m. this procession was observed by Gary Police Officers Delmar Stout and Danny Sorbello who tracked their speed through two changes in speed zones and eventually made a traffic stop of the second van. Inside were a driver and five passengers from the Milwaukee Outlaws chapter. Several were wearing Outlaws colors. The officers observed that the rear of the van was reinforced with ¾-inch steel plate, welded in place, and containing two gun ports. An additional sheet of steel plate was welded behind the driver's seat. Also in the van were long guns, handguns, military-type smoke grenades, walkie-talkies, sap gloves, and numerous rounds of ammunition of various caliber.

7

This racketeering activity, conspiracy to assault and kill rival bikers, is a violation of Sections 35-42-1-1, 35-41-2-4, 35-41-5-2 and 35-41-5-2 of the Indiana Statutes.

Paragraphs 70-73. US 41 International Dragway (Morocco): Conspiracy to assault and murder rival bikers.

On or about June 6, 1996, a group of Outlaws from the White Region, including the defendant, Orville Cochran, traveled from their clubhouses and homes in Illinois, Wisconsin, and Indiana to the US 41 International Dragway, located in Morocco, Newton County, Northern District of Indiana. As with the trip to Illiana and a subsequent trip to the Lancaster Speedway in Erie County, New York, the purpose of the trip was to assault and kill members of rival bikers groups including members of the Invaders, Sons of Silence, Iron Horsemen, and Clove and Hoofs Motorcycle Clubs. Again, according to Outlaw Jay Warneke, who was then the Chicago Southside Chapter president, this event was promoted to the Outlaws membership as a "Double Regional," with members from chapters in the White Region and the newly formed Green Region required to be in attendance. Milwaukee boss Edward Anastas recalled that it was actually designated to be a National Event. According to Anastas, the Outlaws had received information that the Hell's Angels had a large presence at this event in 1995 and that they had reserved several hundred tickets for 1996. According to both Warneke and Anastas, at the beginning of the event, the bosses, including Warneke, Anastas, Frank Wheeler, Ronald Talmadge, James Copollo, Rick Dixon, Raymond Morgan, Kevin O'Neill, Scott Hammond and then Regional boss Randy "Mad" Yager and National boss Harry "Taco" Bowman, had a meeting to discuss guard rotation, shift lengths, who would be the designated spokesperson if a rival gang arrived, and what degree of force they would employ if the rival gang refused to leave. Talmadge brought two old surplus police-type vehicles that the Outlaws used for security at the dragway. Firearms, including a rifle, a shotgun and a handgun were concealed in the vehicle,

8

intended for use by the Outlaws members when they were assigned to the security detail. Ultimately, rain resulted in the eventual cancellation of the races and the bands and most people left the speedway. The Outlaws remained at the dragway for the entire three days. No rival bikers showed up, however, and accordingly, no confrontation ever occurred.

This racketeering activity, conspiracy to assault and kill rival bikers, is a violation of Sections 35-42-1-1, 35-41-2-4, 35-41-5-2 and 35-41-5-2 of the Indiana Statutes.

This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, this offense.

## PENALTIES

6. The parties understand and agree that the offense to which the defendant will enter a plea of guilty carries the following maximum term of imprisonment and fine: up to 20 years and $250,000. The count also carries a mandatory special assessment of $100, and a maximum of 3 years of supervised release. The parties further recognize that a restitution order may be entered by the court.

7. The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney.

## DISMISSAL OF REMAINING COUNTS

8. The government agrees to move to dismiss counts two and four of the indictment as to the defendant at the time of sentencing.

## ELEMENTS

9. The parties understand and agree that in order to sustain the charge of racketeering conspiracy as set forth in count one of the indictment, the government must prove each of the following propositions beyond a reasonable doubt:

9

<u>First</u>, the defendant knowingly conspired to conduct or participate in the conduct of the affairs of the White Region of the Outlaws Motorcycle Club, through a pattern of racketeering activity as described in Count One of the Indictment.

<u>Second</u>, the White Region of the Outlaws Motorcycle Club was an enterprise; and

<u>Third</u>, that the activities of the White Region of the Outlaws Motorcycle Club affected interstate commerce.

## **SENTENCING PROVISIONS**

10. The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

11. The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

12. The defendant acknowledges and agrees that his attorney has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

13. The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

### Sentencing Guidelines Calculations

14. The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

### Relevant Conduct

15. The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offense to which the defendant is pleading guilty.

### Base Offense Level

16. The parties agree to recommend to the sentencing court that the guideline applicable to a violation of 18 U.S.C. § 1961(d) is U.S.S.G. § 2E1.1 (a), which states that the base offense level is 19 or the offense level applicable to the underlying racketeering activity, whichever is higher. The parties further agree to recommend to the sentencing court that because each racketeering act to which the defendant admits is a separate violent offense that is a violation of a state statute, each act is calculated individually under its applicable advisory sentencing guideline provision under U.S.S.G. § 1B1.2(d).

17. The parties agreed to recommend to the sentencing court that the two racketeering acts set forth in this plea agreement have the following base offense levels:

11

a. Conspiracy to assault and murder members of the Invaders Motorcycle Club at the Illiana Speedway, in Schererville, Indiana, pursuant to U.S.S.G. § 2A1.5(a), base offense level 33.

   b. Conspiracy to assault and murder member of the Hell's Angels and Hell's Angels affiliate clubs at the US 41 Dragway, in Morocco, Indiana, pursuant to U.S.S.G. § 2A1.5(a), base offense level 33.

18. The parties further agree to recommend to the sentencing court that the combined offense level for the two racketeering acts is determined by taking the offense level applicable to the offense with the highest offense level and then increasing that offense level by the amount indicated in the table in U.S.S.G. § 3D1.4, that is, one level for each offense that is equally serious. Based on this, the parties will recommend a total offense level of 34.

## Acceptance of Responsibility

19. The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1 (a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility. In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

## Sentencing Recommendations

20. Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters that might constitute aggravating or mitigating sentencing factors.

12

Case 2:01-cr-00108-LA   Filed 10/02/18   Page 12 of 18   Document 445

21. Both parties reserve the right to make any recommendation regarding any and all factors pertinent to the determination of the sentencing guideline range; the fine to be imposed; the amount of restitution and the terms and condition of its payment; the length of supervised release and the terms and conditions of the release; the defendant's custodial status pending the sentencing; and any other matters not specifically addressed by this agreement.

22. The parties understand and agree that based on the nature of the defendant's conduct, a prison sentence is indicated and that any sentence below 5 years (60 months) would be unreasonable. The parties agree to recommend to the sentencing court that the defendant be sentenced to 5 years (60 months) imprisonment.

### Court's Determinations at Sentencing

23. The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 6 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

24. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

### Fine

25. The parties agree to recommend to the sentencing court that no fine be imposed against the defendant.

## Special Assessment

26.     The defendant agrees to pay the special assessment in the amount of $100 prior to or at the time of sentencing.

## DEFENDANT'S WAIVER OF RIGHTS

27.     In entering this agreement, the defendant acknowledges and understands that he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

    a.  If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

    b.  If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

    c.  If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

    d.  At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn, the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

    e.  At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

28. The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

29. The defendant acknowledges and understands that he will be adjudicated guilty of the offense to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

30. The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

31. Based on the government's concessions in this agreement, the defendant knowingly and voluntarily waives his right to appeal his sentence in this case and further waives his right to challenge his conviction or sentence in any post-conviction proceeding, including but not limited to a motion pursuant to 28 U.S.C. § 2255. As used in this paragraph, the term "sentence" means any term of imprisonment, term of supervised release, term of probation, supervised release condition, fine, forfeiture order, and restitution order. The defendant's waiver of appeal and post-conviction challenges includes the waiver of any claim that (1) the statute or

15

Sentencing Guidelines under which the defendant is convicted or sentenced are unconstitutional, and (2) the conduct to which the defendant has admitted does not fall within the scope of the statute or Sentencing Guidelines. This waiver does not extend to an appeal or post-conviction motion based on (1) any punishment in excess of the statutory maximum, (2) the sentencing court's reliance on any constitutionally impermissible factor, such as race, religion, or sex, (3) ineffective assistance of counsel in connection with the negotiation of the plea agreement or sentencing, or (4) a claim that the plea agreement was entered involuntarily.

### Further Civil or Administrative Action

32. The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

### GENERAL MATTERS

33. The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

34. The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

35. The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

36. The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

### **EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT**

37. The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges, which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement.

### **VOLUNTARINESS OF DEFENDANT'S PLEA**

38. The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 10-2-2018

ORVILLE J. COCHRAN
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 10-02-2018

JOHN W. CAMPION
Attorney for Defendant

For the United States of America:

Date: 10-2-2018

MATTHEW D. KRUEGER
United States Attorney

Date: 10/2/2018

for CAROL L. KRAFT
Assistant United States Attorney

Date: 10/2/2018

SCOTT J. CAMPBELL
Assistant United States Attorney

Date: 10/2/2018

LAURA S. KWATERSKI
Assistant United States Attorney

18