# FEDERAL DEFENDER SERVICES OF WISCONSIN, INC.

LEGAL COUNSEL

Craig W. Albee, Federal Defender
Krista A. Halla-Valdes, First Assistant

Joseph A. Bugni, Madison Supervisor
John W. Campion
Shelley M. Fite
Anderson M. Gansner
Gabriela A. Leija
Peter R. Moyers
Ronnie V. Murray
Tom E. Phillip
Joshua D. Uller
Kelly A. Welsh

517 East Wisconsin
Suite 182
Milwaukee, Wisconsin  53202

Telephone 414-221-9900
Facsimile 414-221-9901

December 28, 2018

Honorable Lynn Adleman
Eastern District of Wisconsin
United States Federal Courthouse
517 E. Wisconsin Ave.
Milwaukee, WI 53202

  RE: *United States v. Orville Cochran*, 01-CR-108

Dear Judge Adleman:

  On April 23, 2017, Orville Cochran was arrested at a suburban Chicago *Meyer's* store for trying to shoplift a back brace. After 16 years on the run, Cochran's self-imposed fugitive misery came to an ignominious end. He was in poor health. He'd lost many of his closest family members to death during his absence. And it was time to address these charges.

  Cochran and the government have done just that. Cochran entered a guilty plea to Count One of the indictment, and both he and the government will recommend a 60-month sentence. Cochran asks the Court to adopt that sentence as appropriate and consistent with the goals of § 3553(a) for three main reasons:

- **First**, because of the crimes Cochran was involved in, the prison sentence is warranted. Yet his role in these Outlaw Motorcycle Club ("OMC") RICO acts was less serious than many others that this Court has seen. And unlike

many of his OMC co-defendants, Cochran's criminal record is minimal. It mainly consists of scrapes with the law in his late teens and early twenties and a few incidents. Until he entered his guilty plea here, he'd never been convicted of a felony. He's never been to prison. This stint in jail since his arrest more than twenty months ago is by far the longest he's ever been locked up.

- **Second,** Cochran has significant health concerns, which his 16 years as a fugitive exacerbated. A 60-month sentence, in the words of the government, "maximizes the possibility that he will have a normal life after prison."

- **Third**, this joint recommendation is the product of much back-and-forth discussion between Cochran and his counsel, and a team of lawyers from the United States Attorney's Office. This discussion went well beyond the discovery and available evidence to Cochran's difficult and lost years on the run, and his health records, which the government reviewed. And this months-long exchange produced an agreement that obviated the need for a trial and its attendant significant consumption of resources on all sides.

**Cochran's history with the OMC.**

Orville Cochran pleaded guilty for conspiring, as a member of the OMC, to commit violent acts in June, 1994 at the Illiana Speedway in Indiana and in June, 1996 at the International Dragway in Morocco, Indiana. These events took place in the years before Cochran became a "boss" in the OMC. So he had no role in the planning of these events. Cochran became a chapter president after the commencement of the first round of these OMC cases in the Eastern District of Wisconsin and the arrest of Carl "Jay" Warneke in 1997. Warneke was the president of the Chicago Southside chapter of the OMC, and this is the chapter that Cochran joined in his late 30's.

With regard to these two incidents—Illiana and Morocco, fortunately nothing violent occurred, though the potential for mayhem certainly existed before the events. OMC members travelled in large numbers to these events and many were armed. Had rival bikers shown up, they may have been met with OMC members angry about the recent shooting of club boss Peter "Grease" Rogers (at Illiana), or, at Morocco, eager to push back against territorial encroachment by the rival motorcycle club Hell's Angels.

Cochran deeply regrets this dark chapter of the OMC. He joined the club in the late 1980s after he found himself unmoored and approaching his 40's. He had just gotten divorced after 17 years of marriage. And somewhat peevishly, he had quit a good job.

2

The OMC had always been a presence in his life in the southwest Chicago suburbs. His brother, 10 years older, had many OMC friends who often came to the house when Cochran was a teenager. To a young Orville Cochran, these larger-than-life figures seemed to ride the best bikes, draw the most respect, get the attention from the prettiest girls, and live the high life. Adrift and entering his middle ages, he reached out for that childhood image and probated with the Southside Chapter. He was soon a member, and his world changed. He travelled nationally and internationally as an OMC member. He enjoyed the perks and privileges of life as an Outlaw, and he described the first two years being a member as "over the top," a self-indulgent ride on the OMC patch of partying, and camaraderie, often living for free. Yet it's important to note that he continued to work during his years with the OMC, as a union "rigger" at McCormick Place in Chicago, in the trucking industry, and at times for himself in various capacities. He also helped other OMC members get jobs.

In 1994, according to Cochran, with the national struggle for territory and power between OMC and the Hell's Angels growing, "things went to the dark side." And with the shooting of "Grease" Rogers, in June of 1994, he said "all hell broke loose." Cochran played a role in that struggle by standing side-by-side with fellow OMC members in their self-destructive struggles with opposing motorcycle clubs. Sometimes these struggles became violent, as happened in Lancaster, New York, in September of 1994.

**Cochran's myriad health problems.**
Although he didn't plan it, Cochran soon realized that his arrest in April 2017 was about the best thing that could happen to him. He suspects he may not have lived much longer without medical intervention. He spent about a week in a Chicago hospital after being detained at the Metropolitan Correctional Center. Since being housed at the Dodge County Jail, he's made a number of day trips to the local hospital including two since his October 26, 2018 interview for the presentence report. These have been related to his "Afib" diagnosis (i.e., atrial fibrillation, which increases the risk of heart failure, blood clotting, and strokes), for which he is medicated and monitored. He is also treated currently for depression and anxiety issues. The PSR details other health problems that either need surgical intervention (his hernia), or other ongoing medical attention (high blood pressure, acid-reflux, chronic back pain, tinnitus, bursitis, blood clots, bronchitis).

While in custody, jail medical staff and Cochran have done a decent job of treating and monitoring these health issues, so far as that is possible in a custodial setting. Yet that setting, and the pendency of a federal criminal case, have added dangerous stress to a man already suffering from anxiety and heart disease. The conclusion of this case and arriving at his designated BOP facility should reduce the stress from the unknown. But

for good reason those closest to Orville Cochran fear for his health during his time in prison, as is reflected in some of the letters to the Court. To their credit, the government considered Cochran's health issues when agreeing to this 60-month joint recommendation.

**16 years as a fugitive.**

At the time Cochran was indicted, May, 2001, he had been out of the OMC for nearly a year. By then, Cochran and the rest of the OMC members knew of the fate of their fellow Outlaws who either pleaded guilty or were found guilty after the trial and sentencing hearings in 2000. Cochran knew that "Jay" Warneke received two life sentences, and then he heard that he was named in some of the very same allegations. Though there had been no love lost between Cochran and Warneke during their time together in the OMC, to Cochran's knowledge, Warneke had little if anything to do with at least some of the worst crimes for which he was convicted. Cochran saw what he thought was writing on the wall. He panicked and fled.

For 16 years he had no contact with his fiancé, Lynn Mulrenin, his mother, who died shortly after he ran, or his ex-wife and three children. He feared that any contact would put those people in peril and could get him caught. During this time, his two sons would also die. During these long years separated from anyone who ever knew or cared about him, he managed to get by doing landscaping, home repair, or any kind of fix-it work that might generate some cash and maybe a bed to sleep in. He spent his time in the Chicago area during warmer months and then in Arizona during winters. During those years he received no medical treatment or monitoring, and his health deteriorated. Toward the end of this terrible time, he often needed to lay flat for long periods to try to calm his racing, arrhythmic heart.

**Upon his release from the BOP.**

Orville Cochran knows that he is a very fortunate man. That is so because, despite his 16 years of self-imposed, internal exile, most of those who he was closest to, to the extent they're still alive, have welcomed him back into their lives. This is evident in the letters of support filed with the court, which includes his fiancé, Lynn Mulrenin. They speak nearly every day and have discussed at length what follows Orville's release from prison. Cochran will request that his supervision be transferred to the Northern District of Illinois, which makes the most sense. Not only is he from there, but he plans to live there with Ms. Mulrenin at her home in the far southwest side of Chicago. She has a pet care business where she lives, and Orville plans to help her with many aspects of this business, "Posh Pet."

4

He also has five grandchildren and a daughter that he's lost a great deal of time with and yearns to make up for it as much as he can. Cochran will be in his 70's when released under the joint recommendation, which is a time associated with greatly diminished recidivism. His needs will be met, and his OMC days are long over with.

**Conclusion.**

For all of these reasons, the jointly-recommended 60-month sentence is sufficient, but not greater than necessary to fulfill the sentencing goals set forth in § 3553(a).

Thank you.

Sincerely,

s/John W. Campion
John W. Campion